Richard J. ORLOSKI, Appellant,

v.

**FEDERAL ELECTION COMMISSION, Appellee.**

No. 85–5012.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 17, 1985.

Decided July 11, 1986.

Richard J. Orloski, pro se.

Carol A. Laham, Federal Election Com'n, with whom Charles N. Steele, General Counsel and Richard B. Bader, Asst. General Counsel, Federal Election Com'n were on brief, for appellee.

Before ROBINSON, Chief Judge, BORK, Circuit Judge, and SWYGERT, Senior Circuit Judge, United States Court of Appeals for the Seventh Circuit.*

Opinion for the Court filed by Senior Circuit Judge SWYGERT.

SWYGERT, Senior Circuit Judge:

In this case, we review the Federal Election Commission's method for determining whether corporate funding of an event sponsored by an incumbent congressman is illegal under the Federal Election Campaign Act, 2 U.S.C. §§ 431 *et seq.* (1982) ("the Act").

_____

* Sitting by designation pursuant to 28 U.S.C.    § 292(a) (1982).

Richard J. Orloski appeals from an order of the district court affirming the Federal Election Commission's refusal to investigate his complaint that supporters of Representative Donald L. Ritter violated the Act by sponsoring an event funded in part by corporations shortly before the 1982 federal election. We affirm.

This litigation arises from the 1982 congressional election in the Fifteenth District of Pennsylvania. Orloski, the Democratic candidate, lost the election to the incumbent Republican candidate, Ritter. On September 30, 1982 Orloski filed a complaint with the Federal Election Commission ("the FEC" or "the Commission"). On November 10, 1982 the FEC gave notice to the parties that there was no "reason to believe" that the Act had been violated. Orloski sought review of the determination in the federal district court. The original complaint was dismissed by the district court by joint stipulation on May 26, 1983 to give Orloski an opportunity to present to the FEC additional factual allegations to support his original complaint. The district court also granted summary judgment in favor of the Commission based on Orloski's original complaint. A new complaint, containing these old, as well as new, factual allegations was filed on June 11, 1983.

In his supplemental complaint, Orloski alleged the following facts. Approximately thirty-eight days before the election, on September 25, 1982, the Lehigh Valley Senior Citizens Advisory Committee organized by Ritter sponsored a picnic for more than one thousand senior citizens. Ritter had a poor voting record on senior citizens' issues and had been given a "zero" rating by the National Council of Senior Citizens. Ritter's poor voting record was a major issue in the campaign, and Ritter had never before planned or given a senior citizens' picnic. At the picnic Ritter spoke to the group and indicated to them that he was working to save Social Security benefits and that "as long as he was in Congress, he was committed to that goal."

Orloski further alleged that Ritter's reelection campaign workers, including Ritter's campaign manager, Alex Rosza, planned and attended the picnic. The park where the picnic was held was ringed with posters urging the reelection of Ritter, and red, white, and blue campaign labels and buttons reading "Don Ritter—Congress" were worn by the workers, which were paid for by Ritter's reelection committee. Senior citizens' literature determined by the Franking Commission to be political was distributed. McCormack Equipment, Inc. provided free bus transportation to the picnic; HGF Management Corporation and Newhart Foods, Inc. provided free food. Ritter personally paid for other services that were not in-kind contributions.

According to Orloski, the three corporations first stated that they were not donating the services because the picnic was a political event and, under the Act, corporate donations to political events are illegal. Later the corporations admitted making the donations, claiming that the picnic was a non-political event. Orloski further alleged that one of Ritter's campaign aides stated that the corporate busing and food donations were in-kind donations to the Senior Citizens Advisory Committee and that it solicited and received in-kind donations to hold political rallies for Ritter.

In addition to making these allegations, Orloski stated that the same people who solicited funds for the Ritter for Congress Committee solicited the corporate donations for the picnic, that two of the corporations making the donations were run by traditional Republican contributors who had in the past contributed to Ritter's reelection campaign, and that Orloski supporters had been physically prohibited from attending the closed picnic and from handing out their own campaign literature. Finally, Orloski alleged that, after the picnic, the Senior Citizens Advisory Committee paid for radio advertisements supporting Ritter's reelection; that the Senior Citizens Advisory Committee did not meet in 1982; and that therefore it could not have planned the event.

Based on the foregoing allegations, Orloski claimed that the picnic was a political

rally in support of Ritter's reelection campaign and, as a result, the Ritter for Congress Committee, the Senior Citizens Advisory Committee, and the three corporations had violated various provisions of the Act. Specifically, the Senior Citizens Advisory Committee violated the Act by failing to register with the FEC as a political committee, *see* 2 U.S.C. § 433; the three corporations violated the Act by making corporate contributions to the Ritter Campaign Committee and to the Senior Citizens Advisory Committee to finance the picnic, *see* 2 U.S.C. § 441b(a); the Ritter for Congress Committee and the Senior Citizens Advisory Committee violated the Act by receiving corporate contributions, *see* 2 U.S.C. § 441b(a).

Pursuant to 2 U.S.C. § 437g(a)(1), the FEC solicited a response to these allegations. On October 22, 1982 and August 12, 1983 J. Jackson Eaton, attorney for the Ritter Campaign Committee, responded on behalf of the Ritter for Congress Committee, the Senior Citizens Advisory Committee, and the three corporations. He denied that the picnic was a political rally in support of Ritter's reelection. He stated that no one at the picnic expressly advocated the reelection of Ritter or the defeat of Orloski or solicited or accepted contributions on behalf of Ritter, and he asserted that no campaign speeches were made, no campaign literature was passed out, no campaign staff members were present, and no posters or other campaign material were available except those distributed by Orloski's staff. He also stated that the Senior Citizens Advisory Committee was one of several issue-oriented, non-political, non-partisan advisory groups established by Ritter several years before.

Eaton further asserted that the material available at the picnic consisted of Social Security handbooks, Medicare handbooks, retirement literature, and consumer brochures. He submitted a senior citizens' report bearing Ritter's name that was available at the picnic and noted that it had previously been distributed to constituents through Ritter's congressional office by franked mail. He also observed that notice of the picnic had been included in a mailing approved by the Franking Commission.

He did not deny that free food and transportation were provided by McCormack Equipment, Inc., Newhart Foods, Inc., and HCF Management Corporation, or that Rosza, Jeff Werley, and Joseph McHugh were at the picnic. He stated, however, that Rosza was not the campaign manager or a campaign staff member at that time. Rather, he was a member of Ritter's legislative staff and Lehigh Valley administrator for Ritter. Ritter's campaign manager was John Kachmar. Werley and McHugh were congressional staff members. After the picnic McHugh became assistant campaign manager, at which time he took a leave of absence from the congressional office. Eaton submitted copies of payroll authorizations showing that Kachmar and McHugh had been terminated from the congressional payroll.

Eaton also submitted a copy of the name-tags worn by each person attending the picnic indicating that the tags did not have Ritter's name printed on them. He also stated that Ritter's congressional staff members may have worn tags identifying them as part of Ritter's staff, but that no election tags were used.

Eaton also addressed the issue of the mailing of correspondence to Ritter's constituents which was approved by the Franking Commission. He responded that the Commission does not approve the mailing of political material at any time and does not approve the use of franking privileges sixty days prior to an election regardless of the nature of the literature. Therefore, he argued that Orloski's allegation that the Commission had determined the mailer to be political was untrue.

Eaton further contended that the disputed radio advertisements only mentioned that Senior Citizens Advisory Committee had been formed by Ritter and did not suggest an endorsement. He submitted a copy of the text of the only radio advertisement that mentioned Senior Citizens Advisory Committee. He also indicated that

Senior Citizens Advisory Committee met three times during 1982, and he submitted the congressional form letters that had been sent to Senior Citizens Advisory Committee members notifying them of the meetings. Finally, he denied that any physical threats were made by Ritter's staff to the Orloski representatives, and he submitted twenty-two photographs taken the day of the picnic in support of his contention that no campaign posters were at the event and no campaign buttons were worn.

Based on this information, and without giving Orloski an opportunity to respond, the FEC ruled (5–0), on November 8, 1983, there was "no reason to believe that the Act had been violated" and that, as a result, no further investigation was required. See 2 U.S.C. § 437g(a)(2). In its decision, the FEC first observed that 2 U.S.C. § 441b(a) prohibits corporations from making "any contribution or expenditure ... in connection with any federal election," and any political committee from accepting these prohibited contributions. It noted, however, that in AO 1980–89, 1 Federal Election Campaign Financing Guide (CCH) ¶ 5537, AO 1980–22, 1 Federal Election Campaign Financing Guide (CCH) ¶ 5479, and AO 1980–16, 1 Federal Election Campaign Financing Guide (CCH) ¶ 5474, it had interpreted the Act to mean that corporate funding of events sponsored by congressmen who are candidates for reelection is not prohibited by section 441b(a) if those events are non-political. This interpretation was based on the FEC's view that the Act does not prohibit all corporate donations; it only prohibits corporate "contributions and expenditures." "Contributions" and "expenditures" are defined in the Act as donations made for political purposes— i.e., "for the purpose of influencing any election." Corporate donations made for non-political purposes are therefore permissible.

In each of the advisory opinions, the FEC decided that it would infer from the nature of the event funded whether a corporation made a donation for political or nonpolitical purposes. If the event was non-political the corporate donation would conclusively be presumed to have been for non-political purposes. Similarly, if the event was political, the corporate donation would conclusively be presumed to have been for political purposes. The FEC further determined that an event sponsored by a congressman who was also a candidate for reelection is non-political if it is an event sponsored in the congressman's capacity as a member of Congress, not in his capacity as a candidate for Congress. Recognizing, however, that all events cannot be neatly categorized as either non-political or political, because all congressional events have some political ramifications, see United States v. Brewster, 408 U.S. 501, 512, 92 S.Ct. 2531, 2537, 33 L.Ed.2d 507 (1972), the FEC adopted the following test for distinguishing between political and non-political congressional events. An event is non-political if (1) there is an absence of any communication expressly advocating the nomination or election of the congressman appearing or the defeat of any other candidate, and (2) there is no solicitation, making, or acceptance of a campaign contribution for the congressman in connection with the event.

Applying that test to the facts of this case, the FEC ruled that the Senior Citizens Advisory Committee picnic was a non-political event and hence the corporate donations were permissible and did not need to be reported by the Senior Citizens Advisory Committee because they were made for non-political purposes. Because Orloski did not make any allegations that campaign contributions had been solicited, made, or accepted at the picnic, the FEC focused its analysis on whether any impermissible communications had been made. Based on the buttons and literature submitted by Eaton, the FEC ruled that neither contained any communication expressly advocating Ritter's reelection or Orloski's defeat. It further ruled that Ritter's speech did not expressly advocate Ritter's reelection or Orloski's defeat. Orloski's summary of the speech demonstrated that Ritter was merely "addressing his constituents on a particular subject." It accepted Eaton's

contention that congressional staff members in charge of the event only wore name-tags identifying them as such and not election tags. Based on memoranda and the text of the radio advertisements submitted by Eaton, the FEC accepted Eaton's contention that the Senior Citizens Advisory Committee acted merely as a liaison between Ritter and his constituents and did not act as a political committee. The FEC also ruled that the posters did not constitute a form of communication at the picnic because the posters ringed the park and were not actually in it. The FEC therefore dismissed the complaint.

Orloski filed an action in the federal district court to review the FEC's decision to dismiss his complaint without an investigation. The district judge granted summary judgment in favor of the FEC finding that (1) the FEC's interpretation of the Act was "sufficiently reasonable" to be accepted by a reviewing court, (2) the FEC's decision not to investigate the allegations of the complaint was not arbitrary or capricious or an abuse of discretion, and (3) under the "reason to believe" standard, the FEC could consider all of the evidence and make a subjective evaluation of the claim.

With respect to the FEC's reasons for refusing to investigate the complaint, the district judge held that all of the documentary evidence submitted by Eaton supported the FEC's conclusion that there had been no express advocacy of Ritter's re-election or Orloski's defeat. He further held that Orloski's allegations that the congressional staff members wore name tags reading "Don Ritter-Congress" was not inconsistent with the conclusion that there was no express advocacy of Ritter's reelection. He also agreed with the Commission that it was irrelevant, under the FEC's two-part test, that traditional Republic donors had funded the event or that several of the donors in several local newspaper articles had characterized the picnic as a political event. Regarding the latter allegation, the district judge agreed with the FEC that it was the FEC's job to determine the nature of an event sponsored by a Congressman.

Orloski challenges all three of the district judge's rulings on appeal.

## I

The standard to be applied by this court in reviewing the FEC's decision not to investigate Orloski's complaint is whether the FEC has acted "contrary to law." *See* 2 U.S.C. § 437g(a)(8)(C). The FEC's decision is "contrary to law" if (1) the FEC dismissed the complaint as a result of an impermissible interpretation of the Act, *see* discussion *infra* at 161, or (2) if the FEC's dismissal of the complaint, under a permissible interpretation of the statute, was arbitrary or capricious, or an abuse of discretion. *See, e.g., FEC v. Democratic Senatorial Campaign Committee*, 454 U.S. 27, 31, 37, 102 S.Ct. 38, 41, 44, 70 L.Ed.2d 23 (1981); *In re Carter-Mondale Reelection Committee*, 642 F.2d 538, 542 (D.C.Cir. 1980).

The first issue raised by this appeal is whether the FEC's two-part test for distinguishing permissible donations to non-political events from prohibited corporate donations to campaign events is an impermissible interpretation of the Act. In *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Court delineated the approach to be followed when reviewing an agency's construction of its enabling statute:

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpreta-

tion. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. 467 U.S. at 842–43, 104 S.Ct. at 2781–82. *Accord Chemical Mfrs. Ass'n v. Natural Resources Defense Council,* 470 U.S. 116, ——, 105 S.Ct. 1102, 1108, 84 L.Ed.2d 90 (1985) (court need not find that agency's construction of the statute is the only permissible one, but rather that it is a "sufficiently rational" one to preclude the court from substituting its judgment for that of the agency).

The first step in our review of the FEC's interpretation is to determine "whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc.,* 467 U.S. at 842, 104 S.Ct. at 2781. To make this determination, we look to the plain language of the statute, its legislative history, and its objectives as expressed either explicitly or implicitly in the Act.

The relevant statutory language is found in 2 U.S.C. §§ 431(8)(A), 431(9)(A), and 441b(a). Section 441b(a) prohibits corporations from making "contribution[s] or expenditure[s] in connection with any election to any political office," and makes it unlawful for candidates and political committees to receive such corporate "contributions." Section 433 requires political committees receiving "contributions" or making "expenditures" to file a statement with the Commission. *See* 2 U.S.C. §§ 441b(a), 433. Section 431(8)(A) of the Act provides:

> The term "contribution" includes—
>
> (i) any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office.

Section 431(9)(A) of the Act provides:

> The term "expenditure" includes—
>
> (i) any purchase, payment, distribution, loan, advance, deposit or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office.

Orloski argues first that the FEC's interpretation violates the express language of the Act because the phrase "for the purposes of influencing any election" unambiguously requires the FEC, when deciding whether a prohibited contribution or expenditure has been made, to conduct a subjective inquiry—i.e., make its determination solely on the basis of the state of mind of the donor and not on the nature of the funded event. If the donor admits that he intended to influence the election, the FEC is precluded from deciding on the basis of other facts that the donor has not made a "contribution" and the recipient has not received one. We are not persuaded.

■ We find nothing in the quoted phrase or anywhere else in the Act that prohibits the FEC from adopting an objective test for determining when a corporate donation is made "for the purposes of influencing any election." In fact, as the FEC points out, the Act may implicitly mandate an objective test. The subjective test advocated by Orloski would condition a recipient's liability for receiving corporate donations solely on the state of mind of the donor. Even if the donation did not in fact directly or indirectly influence the election, the recipient would be liable under the Act for receiving an illegal corporate contribution if the corporation intended to influence the election by making the donation. Moreover, clearly the test adopted in this case does not ignore the state of mind of the donor. It is a common legal practice to infer intent from underlying circumstances. In this case, the FEC's objective test is used to infer the probable intent of both the donor and the donee.

■ Orloski further argues that the fact that the term "contribution" also includes "expenditures" "placed in cooperation with, or with consent of a candidate, his agents or an authorized committee of the candidate" precludes the FEC's interpretation. *See* 2 U.S.C. § 441a(b)(2)(B)(i). We reject this argument. There is no doubt in this case that Ritter and his agents consented to the disputed corporate donations. But the mere fact that corpo-

rate donations were made with the consent of the candidate does not mean that a "contribution" within the meaning of the Act has been made. Under the Act this type of "donation" is only a "contribution" if it first qualifies as an "expenditure" and, under the FEC's interpretation, such a donation is not an expenditure unless someone at the funded event expressly advocates the reelection of the incumbent or the defeat of an opponent or solicits or accepts money to support the incumbent's reelection. This expanded definition of "contribution" in section 431(8)(A)(i) therefore does not mean that the FEC's interpretation violates the Act.

Orloski refers us to no other statutory language, nor can we locate any, that directly or indirectly conflicts with the FEC's objective test. Orloski does not dispute the FEC's view that the Act only prohibits corporations from making donations that are "for the purposes of influencing any election" or "in connection with any elections," not those that support congressional events. The Act itself does not define the key phrases—"for the purposes of influencing any election" or "in connection with any election." Indeed, the Supreme Court has observed that the phrases "for the purposes of influencing any election" and "relative to any clearly-identified candidate" are ambiguous. *Buckley v. Valeo,* 424 U.S. 1, 40–41, 79, 80, 96 S.Ct. 612, 645, 663, 664, 46 L.Ed.2d 659 (1976).

Similarly, we find nothing in the legislative history of the Act that forecloses the FEC's interpretation of "contribution" or "expenditure" in this limited context. Nor does Orloski identify any. There is no legislative history indicating that Congress intended to prohibit all corporate donations, and there is "no legislative history to guide us in determining the scope of the critical phrase 'for the purposes of influencing any election.'" *Buckley,* 424 U.S. at 77, 96 S.Ct. at 662.

■ Finally, the Act's purposes do not indicate that Congress disapproves of the FEC's interpretation in this case. The purposes of the Act are to limit spending in federal election campaigns and to eliminate the actual or perceived pernicious influence over candidates for elective office that wealthy individuals or corporations could achieve by financing the "political warchests" of those candidates. *See Buckley,* 424 U.S. at 25–26, 96 S.Ct. at 637–38. Although these purposes indicate that Congress intended to sharply curtail and to regulate in detail campaign financing, they do not directly speak to any limitations on non-campaign financing, and thus they do not indicate how Congress intended the Commission to deal with corporate financing of congressional events.

Orloski contends, however, that the FEC's interpretation has been foreclosed by Congress because it undercuts the statutory purposes in two ways. First, it permits individual contributors to circumvent the statutory maximum on individual contributions by using money from corporations they control to fund events sponsored by incumbents they wish to reelect. Second, it permits corporations to circumvent the prohibitions of section 441b(a) by financing "congressional events" shortly before the election that undeniably have an effect on the election.

Orloski's contention is unpersuasive. It is not the FEC's interpretation in this case that leads to these apparent conflicts with the statutory purposes. It is any interpretation of the Act that permits corporations to make non-political donations because any favorable communication an incumbent has with his constituents necessarily influences the electorate to vote for him in the next election. Thus, any corporate funding of congressional events indirectly influences the election. Yet Orloski does not contest the FEC's threshold determination that the Act permits non-political corporate donations, and he concedes that nowhere in the Act did Congress expressly limit an incumbent's right to communicate with his constituency or a corporation's right to fund "congressional events," even in an election year.

In deciding whether Congress has directly spoken to the precise question at issue in

this case through the statute's purposes, we do not look at these purposes in a vacuum; rather, we look to how these purposes are expressed through the statutory language. "The invocation of disembodied purposes, reasons cut loose from language is a sure way to frustrate rather than to implement the statute. *Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 310 (7th Cir.1986). In this case, the purposes must be read against the clear statutory language that prohibits some corporate donations, but, by necessary implication, permits others. It becomes readily apparent upon reading the statute and its purposes in this way that Congress left a large gap between the obviously impermissible and the obviously permissible. This gap creates the potential for a broad range of differing interpretations of the Act, the legitimacy of each being heavily dependent upon the degree to which it undercuts the statutory purposes. Thus, in our view, Orloski's contention is not relevant at this stage of our analysis. Rather it is relevant to the question of whether the FEC's interpretation is entitled to judicial deference. If the FEC's interpretation unduly compromises the Act's purposes, it is not a " 'reasonable accommodation' " under the Act, and it would therefore not be entitled to deference. *See Chevron, U.S.A., Inc.*, 467 U.S. at 845, 104 S.Ct. at 2783, quoting *United States v. Shimer*, 367 U.S. 374, 382, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961).

We conclude therefore that nothing in the statute or its legislative history indicates, either expressly or implicitly, where Congress intended the FEC to draw the line between impermissible corporate financing of federal election campaigns and permissible corporate financing of legislative activities.

■ The next question, then, is whether the courts should defer to the FEC's interpretation as a permissible construction of the Act. The Supreme Court has held that the FEC is "precisely the type of agency to which deference should presumptively be afforded." *Democratic Senatorial Cam-*

*paign Committee*, 454 U.S. at 37, 102 S.Ct. at 45. In reaching this result, the Court observed that the FEC has been vested by Congress with " 'primary and substantial responsibility for administering and enforcing the Act,' ... [and] [it] has the 'sole discretionary power' to determine in the first instance whether or not a civil violation of the Act has occurred." *Id.* at 37, 102 S.Ct. at 45, quoting *Buckley*, 424 U.S. at 109, 112 n. 153, 96 S.Ct. at 677, 679 n. 153. It further observed that the FEC is expressly authorized by statute, *see* 2 U.S.C. § 437c(b)(1), to "formulate general policy with respect to administration of this Act" and that the FEC, an inherently bipartisan agency, is responsible for deciding "issues charged with the dynamics of party politics, often under the pressure of an impending election." 454 U.S. at 37, 102 S.Ct. at 45. We also note that Congress requires the Commission to issue advisory opinions regarding application of the Act upon receipt of written request. *See* 2 U.S.C. § 437f. This implies that Congress intended the Commission to fill in gaps left in the statute and to resolve any ambiguities in the statutory language. For these reasons, the FEC's interpretation of the Act should be accorded considerable deference. *See also Democratic Senatorial Campaign Committee v. FEC*, 660 F.2d 773, 782 n. 2 (D.C.Cir.1980) (Wilkey, J., dissenting), *rev'd on other grounds*, 454 U.S. 27, 102 S.Ct. 38, 70 L.Ed.2d 23 (1981).

In deciding whether to defer to the agency's interpretation of the Act, the courts look to many factors, among them being the "thoroughness, validity and consistency of ... [the] agency's reasoning." *Democratic Senatorial Campaign Committee*, 454 U.S. at 37, 102 S.Ct. at 44.

■ We have been unable to locate any FEC advisory opinion or General Counsel's report that sets forth the FEC's specific reasons for adopting the interpretation at issue in this case. Nor have we found any case in which this interpretation has been challenged and defended by the FEC. As a result, it is impossible for us to review the thoroughness of the FEC's rationale. Not-

withstanding the FEC's failure to produce a detailed analysis in support of its interpretation, we believe the FEC's interpretation is still entitled to judicial deference for several reasons.

First, we believe that the FEC's interpretation represents a "reasonable accommodation" between the Act's objectives and administrative exigencies.

Administrative exigencies mandate that the FEC adopt an objective, bright-line test for distinguishing between permissible and impermissible corporate donations. As we have previously noted, an objective test is required to coordinate the liabilities of donors and donees. The bright-line test also is necessary to enable donees and donors to easily conform their conduct to the law and to enable the FEC to take the rapid, decisive enforcement action that is called for in the highly-charged political arena.

A subjective test based upon the totality of the circumstances would inevitably curtail permissible conduct. It would also unduly burden the FEC with requests for advisory opinions concerning the legitimacy of corporate funding of an event sponsored by an incumbent, and with complaints by disgruntled opponents who could take advantage of a totality of the circumstances test to harass the sponsoring candidate and his supporters. It would further burden the agency by forcing it to direct its limited resources toward conducting a full-scale, detailed inquiry into almost every complaint, even those involving the most mundane allegations. It would also considerably delay enforcement action. Rarely could the FEC dismiss a complaint without soliciting a response because the FEC would need to know all the facts bearing on motive before making its "reason to believe" determination.

The objective, bright-line test adopted by the FEC also does not unduly compromise the Act's purposes. Clearly, the FEC's interpretation is one of the most favorable to corporations and incumbents that the agency could have adopted. For example, the agency might have adopted the stricter test advocated by Orloski that any congressional event within six weeks of an election is conclusively presumed to be political. *Cf.* Regulations on the Use of the Congressional Frank By Members of the House of Representatives and Rules of Practice in Proceedings Before the House Commission on Congressional Mailing Standards ch. 4 at 30–31, (Feb.1984) (Franking Commission prohibits sending mail out under the frank at any time less than sixty days before an election).

Nonetheless, the FEC's interpretation does not create the potential for gross abuse. It applies only to corporate funding of legislative events sponsored by a congressman. These events by their very nature ordinarily provide a corporation with only limited opportunity to give any significant financial support to a candidate. *See, e.g.,* AO 1980–89, 1 Federal Election Campaign Financing Guide (CCH) ¶ 5537; AO 1980–16, 1 Federal Election Campaign Financing Guide (CCH) ¶ 5474; AO 1980–22, 1 Federal Election Campaign Financing Guide (CCH) ¶ 5479. In this case, for example, the corporate donations consisted of "in excess of one thousand hamburgers, an unknown quantity of salad and potato salad and bus transportation." Although we do not know the exact value of these goods and services, it is unlikely that it is so great that Ritter would be induced to compromise his position as a congressman in favor of the three corporations in order to return that support or to ensure similar financing in the future.

Moreover, the FEC's test still prohibits a corporation from making a donation that has the direct effects of expressly advocating its candidate's reelection or of soliciting financial support. Thus, a corporation has limited ability to engage in the type of effective electioneering that might precipitate substantial political favors. In general, therefore, under the FEC's interpretation, corporations can make little more than insignificant, indirect donations to a candidate's political warchest, which are unlikely to give the corporations improper influence over candidates for federal office or to

significantly increase the level of campaign spending.

Second, the FEC has consistently adhered to this interpretation, without congressional objection, for at least eight years. In 1974, Congress amended the Act to create the FEC to administer and obtain voluntary compliance with the Act. In 1975 the FEC appeared to be leaning toward the view that any funding that had not been expressly appropriated by Congress for legislative activities was a contribution or expenditure under the Act. *See* AO 1975–14, 1 Federal Election Campaign Financing Guide (CCH) ¶ 5107. It is unclear whether the FEC took any enforcement action under this view. Not long after *Buckley* was handed down, however, the FEC appeared to change course and it adopted the interpretation at issue in this case. *See* AO 1978–4, 1 Federal Election Campaign Financing Guide (CCH) ¶ 5293; AO 1977–54, 1 Federal Election Campaign Financing Guide (CCH) ¶ 5301. This interpretation was adopted and applied over the dissents of Commissioners Staebler and Harris who objected to the change without a discussion of reasons for "overruling" AO 1975–14, 1 Federal Election Campaign Financing Guide (CCH) ¶ 5107; AO 1979–2, 1 Federal Election Campaign Financing Guide (CCH) ¶ 5399; and Opinion of Counsel 1975–125, and who characterized the literal application of this test as a "dangerous departure." AO 1980–22, 1 Federal Election Campaign Financing Guide (CCH) ¶ 5479; AO 1977–42, 1 Federal Election Campaign Financing Guide (CCH) ¶ 5313.

Notwithstanding these dissents, as far as we can determine, this interpretation has been applied consistently since 1977 and without dissent since April 1980 and this case represents the first court challenge to the FEC's interpretation, suggesting that it has proven workable to most candidates and that it has not led to gross abuses.

Third, the recent history of the Act leads us to believe that Congress would approve of the line drawn by the FEC. In the 1979 amendments to the Act, Congress did not alter the definitions of contributions or expenditures to include a definition of "for the purposes of influencing any election" even though the Court had observed in *Buckley* that the phrase was ambiguous. The 1979 amendments, which included changes (not relevant here) in the definitions of "contributions" and "expenditures," were made two years after the FEC adopted the interpretation applied in this case. We presume that Congress was aware at the time of consideration and passage of these amendments of the interpretation the Commission had placed on the Act. Its failure to modify this interpretation signifies to a degree its acquiescence in the FEC's interpretation.

In addition, in hearings before the Senate on proposed revisions of the Act, members of Congress and the public expressed displeasure with some of the FEC's restrictive interpretations of the Act. *See* Application and Administration of Federal Campaign Act of 1971, Amended Hearings Before the Committee on Rules and Administration, United States Senate, 97th Cong., 1st Sess. (1981). Many members of Congress were unhappy with what they perceived to be the FEC's overly-rigid adherence to the strict wording of the statute which led the FEC to take, at times, questionable enforcement decisions. Critics of the FEC observed that the FEC was created not only to enforce the Act so that the public would have more confidence in federal elections, but also to encourage voluntary compliance. Voluntary compliance would not easily be achieved if the FEC adopted interpretations of the Act that were difficult to understand and apply. Such interpretations would also lead to a reduction in permissible "contributions," "expenditures," or donations, a result Congress could not possibly have intended because its members are heavily dependent upon such funding. *See also FEC v. Gus Savage for Congress*, 606 F.Supp. 541, 546–47 (N.D.Ill.1985).

Finally, we note that the FEC's interpretation is consistent with *Buckley*, in which the Supreme Court held that under the first amendment, the phrases "for purposes of influencing any election" and "in connection with any election" must be defined as the "express advoca[cy] [of] the election or defeat of a clearly-identifiable

candidate," a definition that was subsequently incorporated into the Act. *See* 2 U.S.C. § 431(17). To be sure, the Court limited these definitions to those provisions curtailing or prohibiting independent expenditures. This definition is not constitutionally required for those statutory provisions limiting contributions, *see Buckley,* 424 U.S. at 78–80, 96 S.Ct. at 663–64. Nonetheless the fact that the Court in *Buckley* formulated these definitions for this statutory language demonstrates that the FEC's similar interpretation of the same language is logical, reasonable, and consistent with the overall statutory framework. The fact that the FEC adopted this interpretation for all relevant statutory provisions, even where not constitutionally required, only adds to its reasonableness for it enhances the consistency and evenhandedness with which the FEC ultimately administers the Act.

We, therefore, conclude that the FEC's interpretation is entitled to judicial deference. We recognize that this interpretation carries with it a greater potential for abuse than does the interpretation advocated by Orloski. Indeed, it can be argued that this interpretation is at the outer bounds of permissible choice. But because it is still a "reasonable choice within a gap left open by Congress ... [Orloski's] challenge must fail." *Chevron, U.S.A., Inc.,* 467 U.S. at 866, 104 S.Ct. at 2793. Any complaints about the wisdom of that interpretation are properly directed to the legislature, not this court. *Manufacturers Ass'n,* 470 U.S. at ——, 105 S.Ct. at 1112; *Chevron, U.S.A., Inc.,* 467 U.S. at 866, 104 S.Ct. at 2793.

## II

Having decided that the FEC's interpretation of the Act is permissible, we now turn to the question of whether the FEC's determination, under its two-part test, that the Senior Citizens Advisory Committee picnic was a non-political event was arbitrary or capricious or otherwise an abuse of discretion. As the district judge observed "[t]his is an extremely deferential standard which requires affirmance if a rational basis for the agency's decision is shown." *Orloski v. FEC,* No. 83–3513,

Memorandum Opinion at 4 (D.D.C., Dec. 6, 1984). We hold that a rational basis has been shown in this case.

Orloski did not allege that any campaign contributions for Ritter were solicited or accepted at the event so our review is limited to the FEC's analysis regarding impermissible campaign communications. The district judge, in a detailed analysis of the evidence presented to the FEC, summarized *supra* at 158–60, found that the FEC's conclusion that there had been no "express advocacy" of Ritter's reelection at the picnic was not arbitrary or capricious or otherwise an abuse of discretion. We have reviewed the evidence submitted to the FEC, and we have little to add to the district judge's succinct, but thorough analysis. True, many of the uncontested facts of this case do suggest that Ritter sponsored the picnic before the election in order to muster support among the elderly. On these facts, it might appear somewhat disingenuous to conclude that at least one purpose of the picnic was not to influence the federal election in the 15th congressional district. But we have previously concluded that the FEC's narrow interpretation of the Act is sufficiently reasonable to be entitled to judicial deference because, in this politically-charged area, bright-line tests are virtually mandated even though they may occasionally lead to what appears, at first glance, to be somewhat artificial results. In this case, the undisputed facts establish that the sponsors of the picnic strictly adhered to the FEC's narrow guidelines, and that therefore the FEC properly concluded that the picnic was a nonpolitical event.

## III

Orloski also challenges FEC's decision on procedural grounds. He argues that the FEC was required either to give him an opportunity to reply to Eaton's response or to make its "reason to believe" determination solely on the basis of Orloski's well-placed allegations without making any credibility determinations. In the alternative, he argues that the FEC impermissibly failed to consider the evidence he presented.

We reject Orloski's first argument as a basis for reversing the FEC's decision for three reasons:

(1) Section 437g(a)(1) requires the FEC to notify parties charged in a complaint and to give them an opportunity to respond. This suggests that Congress determined that the FEC should make preliminary investigative decisions on the basis of all the information submitted to it by the charging and responding parties. *See also Antosh v. FEC,* 599 F.Supp. 850, 855 (D.D.C.1984); *Common Cause v. FEC,* 489 F.Supp. 738, 744 (D.D.C.1980); *In re Federal Election Campaign Act Litigation,* 474 F.Supp. 1044, 1046 (D.D.C.1979). The "reason to believe" standard also itself suggests that the FEC is entitled, and indeed required, to make subjective evaluation of claims. *See Common Cause v. FEC,* 489 F.Supp. at 738. Orloski appears to concede this when he argues that a district court must review the FEC's decision not to investigate by considering, *inter alia,* the credibility of the allegations and all of the information available to the FEC.

(2) Although we are troubled by the secretive nature of these preliminary investigative proceedings in which disputed factual questions may be resolved without giving the parties an opportunity to argue the questions fully, we need not decide today the extent to which and under what circumstances the FEC should afford greater adversarial procedural safeguards in these preliminary matters. In this case, the material facts are not in dispute. The major factual disputes center on which Ritter staff members were present at the picnic and in what capacity they appeared and whether Orloski's supporters were physically barred from attending the affair. Even if these disputes had been resolved in favor of Orloski it would not have affected the FEC's conclusion that there was no "express advocacy" as defined by the FEC or no solicitation, making, or acceptance of any campaign contributions.

(3) Finally, Orloski did have an opportunity to read Eaton's first set of responses filed on October 22, 1982 before filing his first district court complaint. In that complaint, Orloski included a line-by-line rebuttal to each of Eaton's responses. This line-by-line rebuttal was also presented to the FEC in Orloski's supplemental complaint filed on June 11, 1983. And Eaton's second set of responses did not materially differ from his first set. Thus, Orloski did have the opportunity to respond to any facts alleged by Eaton.

We also find Orloski's alternative argument to be without merit. The FEC clearly carefully considered all of the evidence presented by Orloski.

The decision of the district court sustaining the decision of the FEC is affirmed.