Congressman Fortney H. (Pete) **STARK**, Plaintiff,

v.

**FEDERAL ELECTION COMMISSION,** et al., Defendants.

Civ. A. No. 87–1700.

United States District Court, District of Columbia.

Feb. 8, 1988.

---

William C. Oldaker, Manatt, Phelps, Rothenberg & Evans, Washington, D.C., for Stark.

Michael A. Dymersky, FEC, Washington, D.C., for the FEC.

Michael Nemeroff, Sidley & Austin, Washington, D.C., for the AMA and AM-PAC.

## MEMORANDUM AND ORDER

JACKSON, District Judge.

Plaintiff Rep. Fortney H. (Pete) Stark, a Democratic Congressman from California, sues the Federal Election Commission ("FEC"), and others, for declaratory and injunctive relief under the Federal Election Campaign Act of 1971, as amended ("FECA" or the "Act"), 2 U.S.C. § 431 *et seq.* (1985). Stark alleges that the FEC improperly dismissed his complaint of violations of the Act by his Republican opponent and his backers during the 1986 election campaign, and asks that the FEC be ordered to reinstate it, and to pursue the appropriate remedies if, upon investigation, it finds probable cause to believe the violations occurred.[1] The case is presently before the Court on cross-motions for summary judgment, the parties' agreeing that the facts material thereto appear without dispute from the pleadings, and various extracts from the record made before the FEC and attached to the pleadings and motions papers. For the reasons set forth below, plaintiff's motion for summary judgment will be denied, defendants' motion will be granted, and the complaint dismissed with prejudice.

### I.

Shortly before Election Day, 1986, Congressman Stark, the incumbent, filed a complaint with the General Counsel of the FEC alleging multiple violations of the Act by his challenger David M. Williams, the "Williams for Congress Committee," and certain national and state medical associations and their political action committees ("PACs") supporting him, in connection

---

1. Stark also asks that the Court require one of the FEC Commissioners, who held responsible positions with two of the respondents, the American Medical Association and the American Medical Association Political Action Committee, prior to her appointment to the Commission, to recuse from further participation in proceedings upon remand. The disposition made of the case herein makes it unnecessary to reach that issue.

with their common efforts to cause his election. (Williams, in the event, lost the election by a better than two-to-one margin.) The General Counsel elicited responses to the complaint from the alleged offenders, accepted amendments to the complaint adding new charges and a new respondent in February, 1987, and in due course submitted his General Counsel's Report on the matter to the Commission on May 26, 1987.

In his Report the General Counsel recommended that the Commission summarily reject the charges against the national and state medical associations and the latter's PAC, (and charges against the National Republican Congressional Committee added by amendment), but he recommended that it find "reason to believe" that Williams, his campaign committee, and the American Medical Association Political Action Committee ("AMPAC") had violated the Act in several particulars and proceed with the investigation mandated in such cases by 2 U.S.C. § 437g(a)(2). On June 9, 1987, the six Commissioners voted unanimously to accept the recommendations of exoneration, but they divided 3–3 on the recommendations for "reason to believe" findings against Williams, his committee, and AMPAC. Because by statute the FEC is empowered to act only upon "the affirmative vote of 4 members," 2 U.S.C. § 437c(c), the Commission then voted unanimously to dismiss the complaint and close the case. Stark timely filed his complaint in this Court two weeks later as a "party aggrieved" by the dismissal to declare it "contrary to law." 2 U.S.C. § 437g(a)(8)(A), (C).[2]

## II.

The Commission initially took the position that judicial review was not available for dismissals-by-deadlock which are, it says, essentially non-decisions, and it has not yet altogether abandoned hope for that position while it ponders a further appeal of the recent decision of the Court of Appeals for this Circuit which rejected it, *Democratic Congressional Campaign Committee v. FEC*, 831 F.2d 1131 (D.C.Cir. 1987) ("*DCCC*"), decided October 23, 1987, some months after these cross-motions were filed. This Court, however, is not only bound by that decision until it is overturned, it is also satisfied that it is not likely to be, and the Court of Appeals was clearly correct in holding that the section of the statute affording judicial review of dismissals generally, § 437g(a)(8)(A), imposes neither vote-count nor substantive-issue conditions upon the right it confers. In *DCCC*, however, the court found it necessary to remand the case to the FEC to explain why it had deadlocked, over a General Counsel's recommendation to find "reason to believe," " ... leaving undisturbed apparently contradictory [FEC] precedent," *DCCC*, 831 F.2d at 1133, which was not disclosed by the record. In the instant case the reasons for the deadlock are manifested in the separate statements of the Commissioners "concurring" in and "dissenting" from the General Counsel's recommendations as well as the transcript of the Commission's deliberations. This Court's task, therefore, as it understands the teaching of *DCCC*, is to ascertain "whether reason or caprice determined the dismissal of [plaintiff's] complaint," as to which it may consider the statements of the individual Commissioners themselves. *Id.* at 1135.[3]

## III.

The complaint charged, in substance, that AMPAC had made, and Williams and his committee had accepted (and both had failed to report) "contributions or expenditures" in excess of the limit imposed by the Act (2 U.S.C. § 441a(a)), and thus, in violation of the Act. For his purposes the Gen-

---

**2.** Stark does not complain of the dismissal of his charges as to which the Commissioners voted 6–0 to accept the General Counsel's recommendation to find no "reason to believe" a violation had occurred. He objects only as to those charges dismissed by deadlock.

**3.** The standard of review permits the Court to set aside the FEC's dismissal of a complaint which is "arbitrary and capricious," because, by being so, it is "contrary to law." *Orloski v. FEC,* 795 F.2d 156, 161 (D.C.Cir.1986).

eral Counsel thought he had reason to believe Williams, his committee, and AMPAC had violated the law by those facts Stark had alleged which respondents either admitted or did not expressly and categorically deny, coupled with his circumstantial suspicions about the express and categorical denials of the remainder. He also relied upon an FEC advisory opinion addressing PAC-solicited contributions for a candidate in somewhat similar circumstances of some years before.

It appeared that AMPAC had made three mailings to its membership advocating the election of Williams (or the defeat of Stark), one of which was a solicitation of funds for Williams' campaign. The solicitation was accompanied by an envelope, pre-addressed to the "Williams' for Congress Committee" by AMPAC, in which contributions could be directly remitted, and by a pledge card, pre-addressed to AMPAC (by AMPAC), by which contributors could notify AMPAC of their contributions. The solicitation produced some $30,000 of the total of $63,000 Williams spent on his own campaign. And AMPAC acknowledged spending a total of $250,000 of its own money to persuade voters to elect Williams.

AMPAC and Williams insisted that AMPAC's expenditures were "independent expenditures" on which the Act places no limits, i.e., activities "expressly advocating the election or defeat of a clearly identified candidate ... without cooperation or consultation with any candidate, or [his] authorized committee or agent ... and ... not made in concert with, or at the request or suggestion of, any candidate, or [his] authorized committee or agent...." 2 U.S.C. § 431(17). *See* 11 C.F.R. § 109.1. They denied any coordination with one another whatsoever. AMPAC asserted that it simply liked what it knew of Williams (or certainly preferred him to Stark) and undertook on its own to promote his candidacy.

The General Counsel was dubious. In a 1980 Advisory Opinion, A.O. 1980–46, *Fed. Election Camp. Fin. Guide* ¶ 5508 (CCH) (June 25, 1980), the Commission had declared that a PAC which solicited and collected contributions made payable to a candidate for office (or his committee), "bundled" them, and forwarded them to the candidate's committee, would be making an "in kind," i.e., not an "independent," contribution to him to the extent of the cost to it of doing so. The General Counsel saw no significant distinction between collecting and forwarding contributions, and providing pre-addressed envelopes in which they could be directly mailed and verified by a "pledge card" pre-addressed to the PAC. Thus, he concluded, AMPAC had at least made an in-kind contribution to Williams to the extent of the cost of its fund-raising solicitation.

It was also alleged by Stark (and admitted by Williams) that Williams had discussed a televised debate with Stark with a journalist, which might be sponsored by the League of Women Voters, with the AMA as a possible source of funding for it. The debate never took place. There was no evidence that either the League of Women Voters, the AMA, or AMPAC ever heard of the proposal, much less extended any financial support for it. Nevertheless, the General Counsel found that a "number of questions remain[ed] unanswered" about it.

The other mailings made by AMPAC urging Williams' election had purported to set forth Williams' positions on certain issues. The General Counsel found it suspicious that AMPAC could do so accurately without consulting with Williams, or an "agent," as to what his positions were. Williams, who said AMPAC had been only "partially accurate" with respect to his positions, denied any such consultation had taken place, and speculated that AMPAC had gotten its information from newspaper interviews, press releases, letters to the editor, and the like.

Finally, the sheer volume of AMPAC, or AMPAC-inspired support for the Williams campaign in proportion to its total cost "raise[d] questions" for the General Counsel. AMPAC had, ostensibly "independently," spent four times the amount expended by Williams' own committee in trying to get him elected, and had generated, by its

solicitation, nearly fifty percent of the money collected by the committee. (Williams had loaned his own committee $14,000; thus, only $16,000 of some $313,000 known to have been spent promoting his candidacy came from sources other than AMPAC, its solicitation, and Williams himself).

Taken together, the circumstances were sufficient to persuade the General Counsel he had "reason to believe" AMPAC, Williams, and his committee had not remained at arm's length throughout the campaign, AMPAC's expenditures had therefore not been "independently" made, and further investigation was warranted.

## IV.

The three Commissioners who "dissented" from the General Counsel's recommendation, and, in voting, deadlocked the Commission, concurred in a 25–page "Statement of Reasons" for doing so, filed by Commissioner Thomas J. Josefiak under date of June 26, 1987. Expressed in considerably greater detail than they are summarized here, Josefiak's reasons included the unequivocal denials by Williams and AMPAC of the central accusation against them, viz., that they had collaborated in such a fashion as to deprive AMPAC's financial support of Williams' candidacy of its character as "independent expenditures," noting in passing that Williams had made his denial under oath. As to the solicitation of contributions by AMPAC, Josefiak announced that he was in disagreement with A.O. 1980–46 (and had recently so declared as the Commission had considered another advisory opinion), and was unwilling that its rationale be extended beyond its facts. He did not, he said, regard an expenditure independently undertaken to lose its independence retroactively by the fact that a candidate subsequently derived indirect benefit from it.

The allegations with respect to the prospect of an AMA-funded televised debate, Josefiak said, were based on hearsay. Williams' account of the matter asserted that the suggestion of the AMA as a source of funding actually originated with the journalist who had hoped to play a role in the debate. And, in context, the remarks reflected nothing more than "wishful thinking" by the candidate and the reporter, each with his own "separate and legitimate reasons for hoping the debate would occur," neither of whom took "meaningful action" to cause it to happen.

Then, turning to the "dollar disparity" between AMPAC-generated and third-party funding of Williams' campaign, Josefiak observed that there is no plausible logical connection between the level of independent expenditure on behalf of a candidate in relation to the amount of money raised by his campaign committee directly which would permit an inference of collusion. If there were, he said, an inference might as easily be drawn to the contrary of the General Counsel's; in other words, a well-financed candidate committee with a chance of winning would be tempted to coordinate with independent contributors to employ everyone's expenditures to maximum advantage. The General Counsel's "curiosity" as to the explanation for the disparity was, for him, insufficient reason to investigate. "I cannot ... support an enforcement approach based upon finding alleged violations simply because the Commission does not understand or is uneasy about a particular situation."

## V.

Stark observes, correctly, that the very ambiguity of the situation militates in favor of an investigation, and that is all he is calling upon the Commission to do at this point. But if the Commission is not altogether as autonomous as the office of a prosecuting attorney, see DCCC, 831 F.2d at 1134, it is nevertheless surely committed to the Commission's discretion to determine where and when to commit its investigative resources. See Heckler v. Chaney, 470 U.S. 821, 831–32, 105 S.Ct. 1649, 1655–56, 84 L.Ed.2d 714 (1985). Thus, to the extent its decisions in that regard are reviewable for abuse of that discretion, a reviewing court must do so with deference, FEC v. Democratic Senatorial Campaign Committee, 454 U.S. 27, 37, 102 S.Ct. 38, 44, 70 L.Ed.2d 23 (1981), and this Court reads

*DCCC* to require that the same deference be accorded the reasoning of "dissenting" Commissioners who prevent Commission action by voting to deadlock as is given the reasoning of the Commission when it acts affirmatively as a body to dismiss a complaint.[4]

Upon that assumption the Court concludes that Commissioner Josefiak's Statement of Reasons is "sufficiently reasonable," if not "the only reasonable [decision] or even the [one] the court would have reached" on the General Counsel's Report of his findings, *id.* at 39, 102 S.Ct. at 46, and it will, therefore, grant defendants' motion for summary judgment and dismiss the complaint with prejudice.

For the foregoing reasons, it is, this 8th day of February, 1988,

ORDERED, that defendants' motion for summary judgment is granted, and the complaint is dismissed with prejudice.

Asst. U.S. Atty. Robert Chapman, John E. Harris, Crim. Div., Dept. of Justice, Washington, D.C., Commissioners.

David Aufhauser, Howard Gutman, Washington, D.C., for movant Ward.

---

**4.** "The Commission *or the individual commissioners* should first be afforded an opportunity to say why [a] complaint was dismissed in spite of the FEC's General Counsel's contrary recommendation." *DCCC,* 831 F.2d at 1135. (Emphasis supplied).